SCOTT KEITH WILSON, Federal Public Defender (#7347)
SPENCER W. RICE, Assistant Federal Public Defender (#10281)
**OFFICE OF THE FEDERAL PUBLIC DEFENDER**
**DISTRICT OF UTAH**
Attorneys for Defendant
46 West Broadway, Suite 110
Salt Lake City, Utah    84101
Telephone: (801) 524-4010
Email: Spencer_Rice@fd.org
_____

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KEVIN DEAN RASBAND,<br><br>Defendant. | **SENTENCING MEMORANDUM**<br><br><br>Case No. 1:17-cr-0027 TS |

    The Defendant, Kevin Dean Rasband, by and through counsel of record, Spencer W. Rice, submits this Sentencing Memorandum and respectfully requests that this Court impose a prison sentence of 84 months and order that Mr. Rasband be placed on supervised release for five years.

    An 84-month prison sentence is sufficient, but not greater than necessary in this case based on the nature and circumstances of the offense and Mr. Rasband's history and characteristics.   Mr. Rasband's crimes in this case represent aberrant behavior from an otherwise outstanding life full of educational accomplishments, consistent employment,

community service, and commitment to faith and family.  Because Mr. Rasband presents an extremely low-risk of reoffending, and has already shown strong potential for being rehabilitated, an 84-month prison sentence is sufficient in this case.

## INTRODUCTION AND STATEMENT OF FACTS

One of Mr. Rasband's strongest memories from March 29, 2017, was the telephone conversation he had with his wife of six and a half years, Kirsten.  Earlier that day, Mr. Rasband had driven to Las Vegas, Nevada, after robbing -- at gun point -- the First Federal Credit Union in Farmington, Utah.  During that phone call, Kevin expressed to Kirsten his desire to kill himself and attempted to explain all of the lies he had told her and how he had led their family into financial ruin due to his gambling addiction.  After hours of conversation, Kirsten convinced Mr. Rasband to turn his car around and drive back to Utah to face potential criminal charges for serious felonies. Kirsten's father, David Pollard, assisted Kirsten in convincing Mr. Rasband to turn his car around and come back to Utah.

David Pollard has worked as a police officer since 1980.  He had been Mr. Rasband's father-in-law for nearly seven years.  Mr. Pollard was shocked to learn that Kevin was a suspect in two armed bank robberies.  See Exhibit A (Letter from David Pollard).  Mr. Pollard had, to that point, viewed Mr. Rasband as the perfect husband and father to his daughter Kirsten and his granddaughter, Finley.  Mr. Pollard went with Kirsten to meet Mr. Rasband in central Utah, because Mr. Rasband was sounding erratic on the phone and Mr. Pollard wanted to help Kirsten bring him back safely.  Mr. Pollard

2

had also spoken with investigating agents and promised them that he would make sure that Mr. Rasband voluntarily reported to the police station the following morning.

Before leaving to meet Mr. Rasband in central Utah, Mr. Pollard asked Kirsten's brother, Joshua Pollard, to go with them so that someone could drive back the rental car that Mr. Rasband was using. At that time, Joshua Pollard had been a police officer with the University of Utah for two years. Joshua Pollard held Mr. Rasband in high regard for the way he treated his sister and for personal acts of kindness Mr. Rasband had shown him over the years. See Exhibit B (Letter from Joshua Pollard). However, Joshua Pollard was shocked at learning that Mr. Rasband had committed an armed bank robbery.

Once Kirsten met Mr. Rasband in central Utah, Mr. Pollard drove the rental car and Joshua Pollard drove the family car with Kirsten and Mr. Rasband inside. Not much was said in the car as the family drove back to Layton, Utah. Everyone was mostly silent and thinking about how Mr. Rasband's life had ended up at this point where he was the prime suspect in two armed bank robberies that resulted in innocent tellers being terrorized.

Looking back at his younger years, Mr. Rasband had always tried to live the perfect life. Ever since his days in elementary school, he prided himself in achieving 100% attendance certificates and in obtaining "student of the week" awards. He also worked diligently to receive almost perfect report cards in scholastic and citizenship achievement. Mr. Rasband's commitment to his faith was equally impressive. In Junior and Senior High School, Mr. Rasband worked with his mother to mentor

3

disadvantaged and challenged youth.   Mr. Rasband obtained the rank of Eagle Scout at a very early age and served honorably in many church callings and positions.   From 2005-2007, Mr. Rasband served an LDS mission to Spain and learned the Spanish language.

Upon returning from his mission to Spain, Mr. Rasband went on to obtain his Associate of Arts Degree from Weber State University in 2008.   In 2010, Mr. Rasband obtained a Bachelor of Science degree from Weber State University with a Major in Accounting and a Minor in Spanish.   In 2011, Mr. Rasband married Kirsten in the LDS Salt Lake Temple.   After marrying Kirsten, and while employed full-time, Mr. Rasband earned his Master of Taxation degree from Weber State University in 2013.   In 2015, Kirsten and Mr. Rasband had their first daughter, Finley.   To that point, Mr. Rasband had achieved nearly every personal, spiritual, and educational goal he had set for himself. He had tried to live the perfect life, and had largely succeeded.

Beneath the surface of all his scholastic and religious achievements and his general quest for perfection in all things, Mr. Rasband was constantly experiencing guilt and shame whenever he didn't perform perfectly.   He tried to bury those negative feelings by out-achieving others and checking all the accomplishment boxes that he could.   But he would eventually fail or not perform perfectly and would have a personal struggle to try and bury his shame and guilt all over again.   When Mr. Rasband began gambling in 2014, he had never experienced that degree of euphoria and shame in multiple occurrences all while playing a game of cards or watching multiple live sporting events on large screen televisions.

Mr. Rasband's gambling addiction started quite innocently during a training seminar in Las Vegas for his then employer, Eide Bailey. A fellow employee asked him to go to the casino. At first, Mr. Rasband declined, but with a little prodding he eventually agreed to go down and try a few games. Mr. Rasband gambled with small denominations at the Blackjack table and at the Sports Book. Although he lost between four and five hundred dollars, he remembers feeling so much joy when he would win a hand and so much shame when he would lose. He also remembers the excitement and anticipation the moment before the cards were flipped, and the moment before a game would kick off, that he believes he was hooked during that very first experience. When he returned from his trip, Mr. Rasband felt nothing but shame and regret and felt unworthy to be married or to be at church. This similar cycle would repeat itself hundreds of times over the next three years.

Mr. Rasband's addiction to gambling spiraled out of control over the next couple of years. See Exhibit C (showing three years of Mr. Rasband's card-game related losses at various Wendover casinos accounted for nearly one hundred thousand dollars of loss). In 2016, Kirsten confronted Mr. Rasband about discrepancies in their separate checking accounts and why his account was not being used to pay family bills as usually had been the case. When confronted with Bank Statements and actual numbers that could not be explained away, Mr. Rasband admitted to Kirsten that he had been gambling and that he had lost money, but he reassured Kirsten that it was under control and was no longer a problem. Mr. Rasband lied to his wife about the extent of his addiction and the amount

5

of money he had lost. He also lied to his wife about his control over the problem. Instead of seeking help and trying to change, like many addicted people with substance abuse disorders, Mr. Rasband found new ways to lie and deceive to get what he wanted.

Mr. Rasband opened new credit card accounts without telling his wife so he could gamble without her knowing. Mr. Rasband rented vehicles and drove to Wendover while Kirsten was working so she would not notice increased mileage on the family vehicles. Mr. Rasband cashed out his 401k funds so that he did not have to use his monthly salary towards his gambling addiction. As his financial losses increased, Mr. Rasband became more desperate. He was spiraling out of control but didn't have the sense to stop the lie and seek the help he so desperately needed.

Instead of gambling on weekends while his wife was working her seven-on, seven-off schedule at ARUP laboratories, Mr. Rasband began deceiving his employer, Davis County, during work hours. Mr. Rasband would show up to work in the morning and then leave for Wendover during the day, only to return to work in the evening just before quitting time. This routine did not last long and Davis County began investigating Mr. Rasband for time-card fraud in January of 2017. Rather than wait for the results of the investigation to be final and public, Mr. Rasband left his job with Davis County in an attempt to prevent others – especially his wife – from learning of his deception. That was when Mr. Rasband hit rock bottom.

Instead of facing the problem head-on and coming clean to his wife regarding his gambling losses and his lost employment, Mr. Rasband's shame and guilt caused him to

6

bury his problems even deeper and lie to everyone and act like he was still going to work each day. The thought of losing standing and trust with his wife, his parents, his in-laws, his friends and his church leaders was too much for Mr. Rasband to bare. He thought to himself that he would rather kill himself than let others know about his gambling addiction and the ruin he had brought on his family.

Because he was still in full addictive mode, Mr. Rasband continued to tell himself that he could earn back all of his losses if he could just come up with a big chunk of money from some source. He convinced himself that he was smarter than the House and that he could solve all of his problems and keep everyone from knowing the truth about him if he could just get back to the casino and win. That is when he decided the only solution to his problems, short of ending his life, was to rob a bank and head back to Wendover. Mr. Rasband had worked at Credit Unions while attending school. He knew the routines, the schedule, and where the most cash would be available. He needed to get to the vault.

Mr. Rasband had been out of a job for several weeks when, on the morning of February 11, 2017, he robbed his first bank. He dressed in a heavy disguise and ambushed an innocent bank teller with a gun as she opened the bank. Mr. Rasband led the teller into the vault and robbed $23,300.00 from the bank vault. Over the next six weeks, Mr. Rasband attempted, through his self-perceived intellect and skill, to earn back all of his gambling losses. At the end of six weeks, Mr. Rasband was right back where he had been the morning of his first bank robbery, penniless. He had spent the last six

weeks renting cars and lying about his whereabouts to his wife and family. He had also lost all of the money from the first bank robbery.

No longer sleeping and fearing that at any moment his wife and family would find out about his lies and loss of employment, Mr. Rasband robbed another bank under the same misguided and irrational mindset: "that if he could just get back to the casino, he could solve all of his financial problems." On the morning of March 29, 2017, Mr. Rasband pointed the same gun at an innocent bank teller as she opened the bank. Mr. Rasband and the teller waited in the bank for a second bank employee to arrive with the code to the vault. Once Mr. Rasband had a bag of cash from the vault, he ran away as fast as he could.

In the process of running away from the bank, a dye-pack exploded from the bag and Mr. Rasband panicked. He dropped the bag of cash, which also contained his gun, and he ran away. Leaving the gun behind led the police investigators directly to Mr. Rasband's home because the gun was lawfully registered to Mr. Rasband. Mr. Rasband had purchased the gun at Cabela's in Farmington only days before the first bank robbery.

When the police arrived at the Rasband residence, Kirsten was startled that the detectives wanted to talk with her husband, but she was confident that there must be a mistake. She told them they could find him at the Davis County Recorder's office where he worked. A few hours later, the same detectives would be the first to inform Kirsten that Mr. Rasband had left his position two months ago under suspicion of time card fraud.

Kirsten was shocked, confused, and speechless, and she began questioning everything about her relationship with Mr. Rasband and their life together.

As they drove back home from Central Utah that ill-fated night, Kirsten questioned and doubted everything about their life together. But Kirsten was stronger than anyone ever imagined. She knew that Mr. Rasband had a good heart. He was good to her and, more importantly, to Finley.

Over the last five years, Kirsten has learned much about the darkness in Mr. Rasband's life. But Kirsten has also learned that the lies and the deception were symptoms of a diseased mind and that Mr. Rasband still had a good heart. From the moment she met him in Central Utah, on the night of the second bank robbery, Kirsten assured Mr. Rasband that she would support him no matter what. Kirsten knew then, as she knows now, that Mr. Rasband's true character was totally different than the gambling-addicted, bank robber that he had become over the past couple of months.

Kirsten resolved that she would pay off her husband's debts even if it meant working extra shifts to get the money. She has kept this promise to herself. She also resolved to keep her marriage together and to have more children with Mr. Rasband should he get out of prison in-time. Children are the foundation for Kirsten's faith. Kirsten wants the court to know of her love for Kevin and the commitment to support him as he continues to navigate a new path for his family. See Exhibit D (Letter from Kirsten Rasband).

Perhaps more surprising than Kirsten's continued love and support, is the continued love and support Mr. Pollard and Joshua Pollard have shown towards Mr. Rasband over the past five years. For a father-in-law, and a son-in-law, with multiple decades of law enforcement service, to still support Mr. Rasband after all he has put their daughter and sister through, shows that the Pollards also believe that Mr. Rasband has a good heart. They believe that the Mr. Rasband who committed the bank robberies was a desperate gambling addict whose mind and rational thinking had been hijacked by a disease.

The Pollards also believe that Mr. Rasband can return to his former self. If they were to speak at the sentencing hearing, the Pollards would assure this Court that they will be closely watching Mr. Rasband and making sure that every move he makes in the future will be the right move.

The Pollards, however, understand that Mr. Rasband will and must pay a debt to society for his egregious, threatening, and dangerous conduct. They only hope that seven years is enough to satisfy the demands of justice in this case so that Kirsten, Finley, and Mr. Rasband can be re-united to try and piece together their once happy life and make the most of their uncertain, yet still promising future.

## **ARGUMENT**

Mr. Rasband recognizes that an 84-month prison sentence in this case would mean a substantial variance from the Advisory Guideline range for his Bank Robbery convictions. However, such a sentence is justified because of the aberrant nature of Mr.

Rasband's criminal conduct when compared with his personal history and characteristics, his post-offense rehabilitation, and the harsh conditions of confinement he has experienced during the Covid-19 pandemic.

> **I.      Aberrant Behavior**

The Tenth Circuit has found that a substantial variance from the advisory guideline range was appropriate based on the aberrant nature of the defendant's conduct when compared with his history and characteristics.   See United States v. DeRusse, 859 F.3d 1232, 1237 (10th Cir. 2017) (treating as different and distinct a downward variance for aberrant behavior under Section 3553(a) as compared to a downward departure for aberrant behavior as outlined in Section 5K2.20 of the United States Sentencing Guidelines).    In DeRusse, the court upheld a sentence of time-served where the advisory guideline range was 108-135 months based on the aberrant nature of the defendant's criminal conduct.    Id. at 1234-36.    Despite the trauma and horror experienced by the victim, who was kidnapped at gun point and driven around for nearly eight hours, the court found the conduct was aberrational due to the numerous letters of support proclaiming the defendant's good character.    The court also focused on the significant mental health issues the defendant was experiencing and how that impacted his conduct. Id. at 1239-40.

In the instant case, Mr. Rasband's criminal conduct was similarly aberrational when compared with his history and characteristics.    The Presentence Investigation Report (PSR) in this case thoroughly recounts Mr. Rasband's familial, educational,

11

religious, and employment accomplishments. See PSR at pp. 11-16. The PSR also includes attachments to psychological reports that diagnosed Mr. Rasband as having a severe Gambling Disorder as well as Persistent Depressive Disorder. See PSR at pp. 13-14. Mr. Rasband's psychological evaluation also included a risk assessment and concluded that he presented a "low probability of committing future acts of violence," and that any risk that was present "would be mitigated with treatment for the gambling disorder." Id. at p.13. Because the psychological reports have been made available to the Court as attachments in the PSR, this memo will not quote them anymore than to summarize the impressions of Dr. Jonathan Bone as follows:

> What appears to be a primary motivating factor for his substantially poor judgment related to the alleged bank robberies is the pervasive sense of shame and guilt at having jeopardized his family's financial security. Mr. Rasband was raised in an environment where the clear implicit message was do not let the family down and aspire toward very high achievement. In his mind he had failed his nuclear family and his family of origin by engaging in a shameful and secretive pattern of behavior (the gambling). He considered drastic means to rectify his situation, including robbing a bank or committing suicide. While not exculpatory, it helps to understand how a typical, well-educated, professional, family man could engage in behavior that is antithetical to how he was raised and how he had lived his life. He described a sense of desperation that was so profound it usurped his better judgment and decision-making.

Id. at p. 14.

Mr. Rasband's true character is not only manifest by the nature and number of his personal accomplishments, but by the many people who still care for and love him despite the horrible things he did and the lies he told. Many of those people, both family and friends have written the Court expressing their support for Mr. Rasband and

the good character they have observed in him over the years. See Exhibit E (General Letters of Support). Many of the letters are written from people who have known Mr. Rasband for multiple decades and can attest to his true character. Mr. Rasband's family would also like the Court to receive a sampling of the many awards, certificates, achievements and scholastic accomplishments he has received during his life and that they have saved. Those items are attached to this memo as Exhibit F (awards, certificates, and educational achievements).

With the right treatment for his gambling addiction, Mr. Rasband has strong potential for being rehabilitated and becoming a productive member of society again. Mr. Rasband enjoys the support of an amazing family and community in and around Layton, Utah. Many of his biggest supporters are current law enforcement officers who not only still believe in Mr. Rasband, but who will also watch over him and help him on his path to recovery. Because Mr. Rasband's conduct in this case was truly aberrational, a sentence of 84 months is sufficient, but not greater than necessary.

## II.     Post-Offense Rehabilitation

Mr. Rasband had already started the path to recovery before he was even arrested in this case. He has continued his post-offense rehabilitation at the Weber County Jail. A defendant's post-offense conduct can be a significant factor justifying a substantial variance from the applicable guideline range. See Gall vs. United States, 552 U.S. 38, 56-58 (2007) (upholding as reasonable a sentence of probation for a defendant who sold ecstasy for several months based largely on post-offense conduct). Positive post-offense

conduct lends strong support to the conclusion that imprisonment is not necessary to deter the defendant "from engaging in future criminal conduct or to protect the public from his future criminal acts." Id. at 59; see also Pepper v. United States, 131 S.Ct. 1229, 1242 (2011) (stating that post-sentencing rehabilitation may be highly relevant to several sentencing factors such as "history and characteristics of the defendant," and the "need for the sentence imposed...to afford adequate deterrence to criminal conduct [and] protect the public from further crimes of the defendant").

In the instant case, Mr. Rasband's post-offense rehabilitation began when he decided to turn his car around and meet his family in central Utah. Instead of running and hiding and lying from the shame of his addiction and destructive behavior, Mr. Rasband turned around and decided to face the consequences. Mr. Rasband reported to the police station as Mr. Pollard promised he would and he has been in custody ever since. The overwhelming majority of bank robbers do not surrender to the authorities on their own. Mr. Rasband did. That was the first step in his recovery and one of the first rationale choices he had made for many months.

Mr. Rasband has also proven to be a valuable member of the Weber County Jail inmate services staff while he has been incarcerated. On two occasions, Weber County wrote letters explaining the nature and quality of Mr. Rasband's work while he has been an inmate. See Exhibit G (Letters from Weber County Jail). The first letter was written January of 2020, the second was written March of 2022. It is of note that the jail staff writer seemed to be especially grateful for Mr. Rasband's contributions and character

during the last two years of the Covid-19 pandemic.  Id. ("Mr. Rasband has been a vital member of the inmate kitchen/laundry staff during the Covid-19 pandemic").  Mr. Rasband's positive contributions at the jail are an indication of his post-offense rehabilitation and highlight his true character for hard work and helpfulness.

### III.    Harshness of Presentence confinement during Covid-19 pandemic

Mr. Rasband would also ask this Court to consider the harshness of presentence confinement conditions due to the Covid-19 pandemic as grounds for a variance from the applicable guideline range.   Mr. Rasband pleaded guilty in this case approximately three months before the country closed down due to the Covid-19 pandemic.  Since that time, Mr. Rasband has experienced prolonged periods of isolation due to numerous pandemic related lock-downs at the jail.  The pandemic has created conditions of confinement that are much more mentally and emotionally taxing on inmates than normal.  Because Mr. Rasband desired to have this sentencing hearing in-person, he has been incarcerated at the Weber County jail during the entire Covid pandemic.  The Court should consider the difficult conditions of confinement at local jails during the pandemic in evaluating how much prison time to impose in this case.

## **CONCLUSION**

Based on the above and forgoing, Mr. Rasband respectfully asks that the Court impose an 84 months sentence and order that he be placed on supervised release for five years so that he can continue rehabilitating himself with support of his family and the United States Probation Office.

DATED this 19th day of April, 2022.

*/s/ Spencer W. Rice*
SPENCER W. RICE
Assistant Federal Public Defender